Case number 23-5065, National Association of Realtors versus United States of America et al at balance. Mr. Liu for the at balance, Mr. Michel for the appellee. Mr. Liu, good morning. Morning. May it please the court. Fred Liu for the United States. I reserve two minutes for rebuttal. There's no dispute that in November 2020, the Antitrust Division closed its investigation into NAR's participation role in clear cooperation policy. The question is whether, in addition to agreeing to close its investigation, the Division made a commitment not to reopen it. The answer is no. No such commitment appears in the text of the closing letter. The Division repeatedly rejected such a commitment throughout negotiations, and the record shows that when the Division does intend to make such a commitment, it does so in unmistakable language. Can I ask you a question about that, please? If we disagree with you about that, can you still win, or do you concede that that's the dispute, that's the case, what you just said? No, we still win because the ordinary meaning of close, particularly when reading the context of the negotiation history of this case, is that closing did not entail any additional commitment not to reopen it. Well, so I guess I'm saying if we disagree with you about that. If you disagree with our reading of the... Let's say we think that close was a promise to close it and keep it closed. If we disagree with you about that, do you have another theory where you can win, or do you concede that's the case? That is our theory in this court, which is that when the Antitrust Division made the commitment to close, that did not apply any additional commitment to refrain from reopening, and that's clear throughout the record. The Division repeatedly rejected any commitment not to reopen. This is at JA 248, at 252, at 259. Each time the question of whether there would be such a for-looking commitment arose, it was rejected, and not just rejected like we said no. We rejected it categorically. It seems like you kept rejecting it, and they kept refusing to settle with you, and then you relented, and you said, well, if you'll agree not just to the consent decree, which I understand was never ultimately executed, but also to the post... The temporary order and stipulation. It seems like they refused to agree to the order and stipulation until you gave them the promise to close, and then once you finally gave them the promise to close, they gave you consideration for that promise, and the consideration was their agreement to abide by the temporary order stipulation, which required them to make some policy changes. That is all correct. I think it just raises the question, what was the promise to close? None of what your honor said answers that question. When we relented and said we would agree to close, we did not relent on giving any sort of commitment to refrain from reopening, and the clearest place to see this in the record is JA-259. This is the August 12th letter from Michael Murray back to NAR, and the last sentence of that letter says, as I previously explained, we can't make any commitment not to reopen, and then the very next thing in the JA, JA-260, is a letter from NAR back to the Antitrust Division dated August 18th, and it says we accept the terms of that proposal. So how do you respond to the analogy that NAR gives? A parent tells the child, close the door. The child does not obey that order by closing the door and then immediately reopening the door. I think as NAR acknowledges on page 22 of its brief, context is critical, and the relevant context here is supplied by the back-and-forth communications between the two parties on this very issue. We rejected it three times. After the last time we rejected it, it's not like the parties moved or there was further negotiation. The very next communication from from NAR is we accept. We accept what JA-259 tells us. As Michael Murray previously explained, no commitment to never investigate again, and in fact if you look at the record, the very first time this idea that the closing letter could be read to contain some sort of commitment, some sort of limitation on the future exercise of executive branch discussion doesn't come up. What was the closing letter worth? It seemed to be very important to NAR that they get what they got in the closing letter. What do you think it was worth? I think there are three important benefits that NAR got from the closing letter, even as we interpreted. Number one, as a practical matter, the closing of the investigation created inertia against reopening, and that's because there's an internal process within division to decide when to reopen something. Now it's true as an ex-ante matter, you can't tell how much that practical benefit is. You don't know if it's going to be two months until the division decides to reopen. It's going to be a couple of years, but nonetheless, any delay in a new investigation coming up is a benefit. That's not nothing. Maybe it's not nothing. What are the second benefits? The second benefit is the PR benefit. We saw this the day after we gave NAR the letter on November 19th. On November 20th, they took the letter and filed it in pending private litigation in the Central District of California involving the clear cooperation policy, and to this day, NAR continues to invoke this letter, I think to imply that the division doesn't have too much of a concern with the two policies at issue. And the third thing is they got the immediate benefit of not having to respond to the CIDs that were then pending. But I think, I was just going to say, I think it would be wrong to think of the closing letter as the only source of benefit that NAR got from this deal. You're right that they said we weren't going to sign on to the consent decree unless we get this closing letter, but parties all the time in deals say things like, we'll agree to this if you throw in one more thing. Do you have any concern that what DOJ is doing here will make it harder for future DOJs to convince parties in NAR's shoes that when DOJ says it will close an investigation, it will stay closed for more than a half minute? No, because we made clear throughout the process that we weren't making that commitment. So we have, we're not concerned at all that in the future we won't be just as clear. We thought we were just as clear here. The only reason this contract isn't more specific is because NAR had no incentive to ask for more specificity. If they had, they already knew the answer. I've been so much of your time and I'm grateful to my colleagues for letting me. One more question, I think just one more. Why did DOJ do what it did in 2021? What explains it? Well, I think we had two sets of policies in front of DOJ at that time. We had the four policies that ultimately became the subject of the proposed consent decree. And those were policies where the two parties were able to reach some sort of agreement. Then we had the two policies that were the subject of the closing letter, the clear cooperation policy and the participation rule. Those were policies that the parties remained far apart. And so I think the thinking of the division in November 2020 was we got two months left, let's finish what we can. And so they finished their work on the four policies and they said our administration is ending in two months anyway. We're not going to be able to finish any investigation into these two policies. It's no skin off our back to agree to close them. It's a small price to pay for getting NAR's consent to the proposed judgment on these four things. But at no point did Makan Delrahim and Michael Murray think that they were binding the future exercise of executive discretion. It's not as if they told, they repeatedly told NAR from July through August 2020 that they couldn't make that commitment. And then at the last minute did a 180 and did the very thing that they described repeatedly as a non-starter and contrary to department policies. That's simply not a plausible reading of this record. And to your last question, Judge Walker, about whether the department is concerned about the effect of this decision on future negotiations, I think it's completely the opposite. If something like the district court's decision is allowed to stand, it will destabilize our ability to negotiate these I think NAR should have gotten more out of this deal than they actually got. I don't think this closing letter is really worth the piece of paper it's written on. So I'm going to read into the closing letter some sort of commitment. Does DOJ ever do what NAR says they did here? Absolutely. I think it's not exactly the same, but the closest we will do to something like this is not to prosecute. And I think the difference is telling. Look at Exhibit K and L to NAR's reply in the district court. This is a model leniency letter from the antitrust division and a model plea agreement from the antitrust division. And in paragraph 3 of the letter and in paragraph 15 of the model plea agreement, you will see the unmistakable sort of language we use when we do want to constrain future exercises of discretion. We say, quote, the United States agrees that it will not bring further charges. That's the sort of unmistakable language that's missing here. But I should also emphasize that what NAR thinks we gave up here is even more extraordinary than those plea agreements, because those plea agreements agree that we won't bring further charges for specified past conduct. The policies at issue here are ongoing potential violations of the antitrust laws. And I think as the OLC opinion that's cited by both parties and is attached as Exhibit A to NAR's ply below shows, this is pretty unusual. And you would think that when the executive does this, it would make its intention manifest. I see that I'm over my time. So I want to go back to Judge Walker's first question, which was, are you relying on anything else? And it seems to me that there is a plausible argument that this closing letter, if it's part of an overall agreement that included the consent decree, was withdrawn when the consent decree was withdrawn. Are you not making that argument? We're not pressing that argument as a standalone argument here. But I do think the history of why, I think the history of the withdrawal and what it shows about why we withdrew supports our interpretation of the closing letter. So you're just relying on your interpretation of the closing letter and not that it has been withdrawn? Correct. And on the unmistakability principle, you didn't raise that in the district court. Is that something that you're allowed to raise on appeal if you did not raise it? Yeah, I think so for two reasons. The first reason is this court, like the Supreme Court, has distinguished between issues and arguments. And it has said that so long as an issue was preserved below, a party can raise additional arguments relating to that issue. We view the relevant issue here as what the meaning of close was between the parties. And this is just an additional argument that supports it. The second reason is that the sort of unmistakability principle appears in Exhibit A to NAR's own reply that it submitted in the district court. This is the OLC opinion that on page 146 says that courts often construe executive branch settlements narrowly out of respect for executive branch prerogatives, and so as not to bind future administration. So NAR itself put this doctrine in front of the district court, and I think it's pretty fair that we get to rely on it too. Thank you. We have a couple minutes of reply. Appreciate it. Thank you. Thank you, Your Honor, and may it please the Court. Chris Michel for Appelli National Association of Realtors. This case can be resolved on straightforward, narrow, common-sense grounds. The government does not dispute that it entered into a binding contract with NAR. The government does not dispute that that contract required it to close its investigation into two enumerated NAR rules in return for valuable consideration. And the government does not dispute that it resumed that same investigation into those same rules, not because of any change in the rules or the law or the facts, but simply because DOJ changed its mind. As my friend Mr. Liu concedes this morning, DOJ's entire case depends on its contention that its binding promise to close the investigation left it with precisely the same unfettered discretion after it made that promise as it had before it made that promise. But under that reading, DOJ's promise would mean essentially nothing at all, and NAR's surrender of valuable consideration would make little sense. Opposing if you don't gain what you think you gain from the promise. What's your response to that argument? Well, I think we didn't gain much of any value from any of the things Mr. Liu mentioned. I think the first thing he mentioned was some sort of inertia within the government. Of course, the letter didn't say, you know, we will apply increased inertia against reopening the investigation. The letter said we will close the investigation. The PR benefits, you know, again, that was not something that I think is memorialized in any of the negotiating history. And the third benefit, I can't quite recall what he said. I just want to confirm, it's true that your client has used that letter, submitted it in other cases. We have publicized the letter, although I guess to take on the thrust of Judge Walker's question, even if the benefit, you know, more than zero benefit, the question in the case is not whether the letter had any benefit. The question is what the parties bargained for. And I think there are multiple sources of contract meaning that indicate that the letter was worth more than as the district courts, it had to be worth more than as the district court said the paper that it was printed on. I mean, I'd start with the ordinary meaning of the term close, particularly in the context of and I agree with my friend, Mr. Liu, that meaning depends on context. But in the context of an investigation, closing has to mean something more than the government having the same discretion that it had before it made the promise to close the investigation than it did after it made the promise to close the investigation. Otherwise the promise doesn't mean anything. But you're conceding now that your client did receive a benefit from being able to use this letter and in other cases, because I thought you started your argument by saying there would be no benefit to this if it wasn't also a commitment not to re-prosecute. But now you appear to be conceding that there were other benefits. I'm sorry, Judge Fan, I didn't mean to. I concede that we did display the letter and publicize the letter. I don't think we derived any significant benefit from that. But I also don't think the case turns on that. I understand. I just wanted to confirm what your position is. I thought you started saying it had no value. To Judge Fan's point, it does seem like one of your strongest arguments would be if the government's right, then the promise was not worth the paper it was printed on. And maybe it was helpful in the way the government said as its second reason. But I think the first reason also seems like it might have been helpful to you, the inertia point. And, you know, you might be a little bit more, we might be a little bit more transparent in how we think of the inertia point by saying you gained the benefit of being pretty confident that if the personnel and the antitrust division didn't change after the election, you'd be good to go. But you made that bet and you lost the bet. Well, a couple of responses, Judge Walker. I think, of course, we're trying to determine what the words of the contract mean here. And the government's position, I don't take Mr. Liu to disagree with this, is that the government could have, consistent with its understanding of the letter, reopened the investigation immediately, you know, the night of or the morning after it sent the closing letter. It's true that some time went by. But I don't, as Mr. Liu said this morning, I don't think he's making any argument that's based on how much time and so you might have thought that's very unlikely. Actually, what was the timing of the closing of this agreement? It was in November of 2020. When? It was a 19th, November 19th, November 20th. I think that's correct. Yeah. November 19th is the closing letter. One thing that the government pointed out is on J.A. 259, DOJ said that the antitrust division just cannot commit to never investigating or challenging the two rules in the future. And I think the government is suggesting when it said that it just meant we don't have the power. We don't, maybe we don't even have the constitutional authority to bind a future DOJ. What's your response to that? Sure. Two responses. First, I do think the text matters. And the text says the division, sorry, this is page J.A. 259. The division cannot commit to never investigating or policies in the future. That is far more than we're asking for from this court or that the district court interpreted the letter to provide to us. We're not asking for a commitment to never investigate and we're not asking for a commitment to never challenge NAR's rules and policies. We're talking about two specific enumerated rules and policies and we've taken the position throughout the case that if those policies change in some way, the closing letter does preclude the government from investigating those. So I think what Mr. Liu said was his best evidence ultimately doesn't show that the government rejected the interpretation of the closing letter that the district court adopted. Now to your deeper, your broader question about the government's authority, I think it's frankly an alarming proposition that the government is saying it either doesn't have authority or gets some tremendous thumb on the scale anytime it has to do so clearly and unmistakably. Our first submission is that it did so clearly and unmistakably. Let's talk about that because I'm looking at the language of this letter and I don't see how you can read it to make any commitments about the future. It says the antitrust division has closed its investigation, talking about a particular investigation, and then it says NAR will have no obligation to respond to CID numbers. It gives you numbers issued on these particular dates. It's talking about a particular investigation and particular CIDs. It's not saying anything about any other investigation, any future investigation. It's not making any commitment about the future. And then it says no inference should be drawn from the division's decision to close its investigation into these rules, etc. I don't see how you can read into this any kind of commitment about not prosecuting in the future. The plain language. I agree the plain language is future tense, plain language. In the second sentence of the letter, it said after it says DOJ has closed the investigation, it then says accordingly. In other words, as a result of DOJ closing the investigation, NAR will have no obligation to respond to the two enumerated CIDs. The enumerated CIDs. It doesn't say we can't issue another one. It doesn't say they can't issue another one, although I don't even take the government to be taking the remarkable position that it could simply renumber the CIDs and ask for exactly the same information. Where do you get, I will not in the future investigate you on these two policies? Sure, two things together. The ordinary meaning, well, a number of things really, but the ordinary meaning of the word close, which we think implies something more than authority to immediately reopen, coupled with the future language. Wait, don't gloss over that. The ordinary meaning of we close, it's closed. This one is closed. What does that say about reopening? Sure. I think in the context of an invest, as I said earlier, in the context of an investigation, the commitment to close has to mean something more than the government retaining precisely the same. Investigations are reopened all the time. Investigations are reopened on occasion. I think the government at page 53 of its brief says in the ordinary course, it's not unusual for investigations to be reopened. It's certainly possible for investigations to be reopened, but is this important? It is not unusual. Do you agree with that? I mean, I think there are cases set. Isn't there a Seventh Circuit case, Shellingcraft or something? I mean, there are lots of examples of investigations being closed. I agree with you, Judge Payne, that that's an important case to look at, the Seventh Circuit case. And there's a critical difference between that case and perhaps the frequent reopenings you're referring to. And in those cases, there's no contract. There's no exchange of consideration from the recipient of the promise to close. We're just interpreting closed here. We're talking about the word closed. Right. And the plain and ordinary meaning of closed does not imply and will never reopen. All I'm saying is that things get reopened. It's not unusual. And so we're just talking about the meaning of this word. And given that this is not an unusual thing, how can you read closed to mean and will never open this again? I think both in the context of the letter itself and in the context of the parties bargaining, for example, the district court found as a matter of... I think if it's clear and unambiguous against us, I'm not sure you would need to get to the... Either way, if it's clear and unambiguous for or against... Well, yeah, if it's clear and unambiguous for us, you don't need to look at it. No, but I do think it's an accepted principle of contract interpretation to look at the party's bargaining history. But even aside from the bargaining history... And I agree it's clear. We think it's clear and unambiguous in our favor. I mean, I would take just to give another example of what I think is common sense that can be applied to understanding this. If I close the door, does that mean I'm never going to open it again? No, I agree there are contexts where it would make sense to reopen again. But as Judge Walker alluded to earlier, I think I can come up with hypotheticals where it would be quite surprising that you would immediately reopen it. For example, if... But we're not talking about immediately. You're saying that this says never again. Well, I want to be very clear, Judge Pan. I don't think Mr. Liu disagreed with this. The government's position is that it could reopen immediately. I know that, but your position is they can never ever in the future ever reopen an investigation about clear cooperation policy or participation rule? I'm sorry if I've left that impression. Our position is that they can reopen the investigation if there are any material changes in these policies. Where is that in this letter? I think that's an interpretation of what it means to refer to an investigation. Isn't that in the stipulated order? Stipulated temporary order? That, I think, referred to what was in place between the time of the closing letter and the There's a commitment in the consent decree that NAR will adopt certain rules that correct the policies that DOJ was objecting to. If NAR had adopted that rule and then repealed it the next day or the next week, I don't think DOJ would say the plain meaning of adopt was satisfied by what you did in this case. And I don't think DOJ would say, oh, you're improperly reading words in there by saying we didn't say adopt and not repeal. I think there's an ordinary common sense meaning here, particularly in the context of a bargain for closing of a law enforcement investigation that implies not immediate reopening with total discretion, which is the import of the government's position in this case. And, of course, the government itself, and I don't fully understand Mr. Liu to disagree with this either, appeared to operate under the impression that it was constrained by its promises in this settlement. And that's why it didn't immediately reopen the investigation in 2021, as it could have if it believed the argument that it's advancing today. Instead, it went through a labored process of attempting to renegotiate the consent decree and ultimately withdrawing from the consent decree. And I think you should look at the government's actions and conduct in real time as opposed to its post hoc litigation rationale and determining what it best indicator of their understood meaning. Can you respond briefly to the argument about the unmistakability doctrine that the government makes, the forfeiture part. The government says this canon is just like the expresso unis canon and you can no more forfeit an unmistakability canon than you can expresso unis canon. And to respond to this too, for better or worse, I think our court has some opinions saying even Chevron cannot be forfeited. I think the better understanding of it is that it is a doctrine under which courts can trump the ordinary words of a contract. It's not just a canon of construction. I think it's rather unfair for the government to chide Judge Kelly for flouting the unmistakability doctrine when it didn't even mention it. So I do think the better understanding is it can be forfeited. But in all events, I don't think it applies here. I would just look at this court's, you know, parade of cases over the years interpreting contracts like this one, settlement agreements, plea bargains, without applying anything like the unmistakability doctrine. You know if there's ever been a precedent that says the unmistakability doctrine can be forfeited? I don't know if there's a precedent on that, Your Honor. But I do think there's a, I would look at, you know, for example, this court's decision in the Moreno-Membace case, which we cited where the government, where this court interprets a plea agreement without any kind of unmistakability thumb on the scale. Judge Garland's opinion for the court, then Judge Garland's opinion for the court, the Seeger versus Mukasey, where the government gave up hiring discretion, certainly a sovereign power. And the court, you know, meticulously applied different canons of contract interpretation without any unmistakability. The Supreme Court's cases in ITC Continental Baking and United States versus Armour, two cases at the government sites that are about antitrust consent decrees, in other words, contracts in the antitrust space in which the government gave up enforcement discretion. There's no hint of the unmistakability doctrine there. So I think I think it would be candidly a radical expansion of the unmistakability doctrine to apply it to a simple exercise of enforcement discretion of the kind the government undertook in this case. All right. Thank you. Thank you, Your Honor. Thank you, Your Honor. Just a few quick points in rebuttal. First, about this discussion about J.A. 259 and the word never. My friend suggests that we merely rejected a very rigorous limit that said we would never we would never investigate again. I don't think that squares with the record. The page on J.A. 259, Michael Murray is referring back to previous communications. If you look at previous communication on 248, he is referring to a commitment not to challenge these rules in the future, and he calls it a non-starter. That is a categorical rejection, not just a rejection of one form of a limit. And then another thing that reinforces that is, again, what I said earlier. After Michael Murray on J.A. 259 says we can't commit to never doing this again, it's not as if there were more negotiations toward some more modest limit that contains some material change language. No. After that, the very next communication is we accept those terms. So there's no way to squeeze out a material change limitation from this record. The second point I just want to make is about the suggestion that the course of performance after the closing letter suggests that the government had a different view of the closing letter than we do today. That's simply untrue. After the closing letter was sent and after the government received comments through the Tuney Act process, we looked at those comments. We thought about the proposed consent decree. We decided we wanted to withdraw. The reason we wanted to withdraw wasn't because we thought there was something wrong with the closing letter, which we viewed as a side deal and not even part of the Tuney Act process. Rather, it was because we were concerned the that would preclude. Can you point me to a precedent where the government has made a promise in exchange for consideration to close an investigation and the court has said that the government can reopen the investigation? Not in a case where we made a promise to do it, but there are cases where there are letters that say we're going to close an investigation and the court doesn't construe those letters to mean that those investigations wouldn't open again. Did those cases have consideration in exchange for promise? No, I'm thinking of the the Seventh Circuit case in Schellenbach, which construes a closing letter. You said today that there was consideration. And there was consideration here. So I don't think the fact that the Schellenbach case didn't have consideration means anything. I would analytically think of this in two pieces. One, did the United States make a commitment to close a commitment? And we acknowledge that we made a commitment to close. And if you look at J.A. 20 to 21, N.A.R. acknowledges that we closed. They say on J.A. 20 to 21, consistent with the terms of the agreement, the antitrust division closed the investigation. Then the question is, does the meaning of close encompass something broader? And I do think cases like Schellenbach, even though they don't involve an exchange of communication, are relevant to that ordinary meaning interpretation. I see that my time is up. Thank you. Thank you.
judges: Henderson, Walker, Pan